**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

ROY C. ARMSTRONG,                          )   NO. SACV 09-725 SS
                                           )
                  Plaintiff,               )
                                           )
          v.                               )
                                           )   **MEMORANDUM DECISION AND ORDER**
MICHAEL J. ASTRUE,                         )
Commissioner of the Social                 )
Security Administration,                   )
                                           )
                  Defendant.               )
_____        )

**I.**

**INTRODUCTION**

    Roy C. Armstrong ("Plaintiff") brings this action seeking an order to overturn the decision of the Commissioner of the Social Security Administration ("Commissioner" or the "Agency") denying his application for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB").  The parties consented, pursuant to 28 U.S.C. § 636(c), to the jurisdiction of the undersigned United States Magistrate Judge.  This matter is before the Court on the parties' Joint Stipulation ("Jt. Stip."), filed on March 3, 2010.  The Court has jurisdiction to review the final decision of the Commissioner pursuant

to 42 U.S.C. §§ 405(g); 1383(c).  For the reasons stated below, the decision of the Commissioner is AFFIRMED.

## II.

### PROCEDURAL HISTORY

On April 3, 2007, Plaintiff filed an application for SSI benefits. (AR 106-08).  Plaintiff alleged an onset date of April 1, 2003.  (AR 106).  On July 24, 2007, the Commissioner denied Plaintiff's disability claim.  (AR 60-63).  Plaintiff requested a review of the decision and received a second unfavorable decision on November 08, 2007.  (AR 64-68).  On December 19, 2007, Plaintiff filed a Request For Hearing By Administrative Law Judge ("ALJ").  (AR 70).  On October 20, 2008, Plaintiff appeared with counsel and testified before the ALJ.  (See AR 26, 28-50).  On March 11, 2009, the ALJ issued her decision, finding that Plaintiff was not disabled under section 1614(a)(3)(A) of the Social Security Act.  (AR 10-19).   The Appeals Council denied Plaintiff's subsequent Request for Review on May 27, 2009.  (AR 1, 188). Plaintiff commenced the present action on June 24, 2009.

## III.

### FACTUAL HISTORY

Plaintiff, who is a forty-seven year old high school graduate with a history of alcoholism and alcohol related injuries, alleges disability due to depression and head trauma.  (See, e.g., AR 256).  Plaintiff contends that the head trauma has impaired his memory and concentration

2

such that he cannot work.  (AR 123-24).  He alleges an onset date of April 1, 2003.  (Id.).

**A.**   **Relevant Medical History**

    **1.**   **Treating Physicians**

Dr. Ian Levenson is Plaintiff's primary care physician.  (AR 228; see also AR 278-306).  Dr. Levenson has characterized Plaintiff as having "a history of alcohol abuse and . . . multiple hospitalizations for alcohol withdrawal."  (AR 240).  Dr. Levenson prescribed Tranxene[1] and Lexapro[2] for Plaintiff's withdrawal symptoms and his depression.  (AR 275).  As Plaintiff's primary care physician, Dr. Levenson also received Plaintiff's Emergency Department Reports ("EDR") and discharge summaries discussed below.

On October 6, 2005, Dr. Kim Trampe-Decker, submitted an EDR for Plaintiff's treatment at Sky Ridge Medical Center.  (AR 275-76).  She noted his "severe alcoholism" and reported that "[Plaintiff] is currently on probation for a DUI and he came up positive for alcohol and

---

[1] Tranxene is used to treat "acute alcohol withdrawl" and anxiety. Web MD, Drugs & Medications – Tranxene Oral, http://www.webmd.com/drugs/drug-63990-Tranxene+Oral.aspx?drugid=63990&drugname=Tranxene+Oral&source=2 (last visited Apr. 2, 2010).

[2] Lexapro is an "antidepressant medication used to treat depression and a variety of other mental/mood disorders."  Web MD, Drugs & Medications – Lexapro Oral, http://www.webmd.com/drugs/drug-63990-Lexapro+Oral.aspx?drugid=63990&drugname=Lexapro+Oral&source=2 (last visited Apr. 2, 2010).

state[d] that he decided that if he was going to go to jail that he might as well just drink as much alcohol as he could possibly drink until that happened." (AR 275). Dr. Trampe-Decker diagnosed Plaintiff with alcohol withdrawal, alcohol induced hypertension, and depression. (AR 276). She recommended that he continue his Lexapro for depression and start Metoprolol[3] for his alcohol induced hypertension. (<u>Id.</u>).

On October 6, 2005, an EDR for Plaintiff's treatment at Sky Ridge Medical Center was created. (AR 272-73). Plaintiff had been drinking "a quart of hard liquor per day as well as two six packs of beer." (AR 272). He stopped drinking to pass a court-ordered Breathalyzer and began feeling "shaky, tremulous, and vomiting." (<u>Id.</u>). Plaintiff stated that he "feels disabled by his drinking problem." (<u>Id.</u>). Plaintiff was diagnosed with alcohol withdrawal. (AR 273).

On October 10, 2005, Dr. Elizabeth Benish, a Critical Care Consultant, submitted an EDR for Plaintiff's stay at the Sky Ridge Medical Center. (AR 270). Plaintiff had been "drinking for several days" and was admitted with "nausea and vomiting for two days" and "tremors." (AR 271). Dr. Benish diagnosed him with "alcohol withdrawal," "transient hypertension with withdrawal," and "alcoholic hepatitis," as well as depression and tobacco abuse. (Ar 270).

---

[3] Metoprolol is used to treat chest pain, high blood pressure and heart disease. Web MD, Drugs & Medications – Metoprolol Oral, http://www.webmd.com/drugs/drug-63990-Metoprolol+Oral.aspx?drugid=63990&drugname=Metoprolol+Oral&source=2 (last visited Apr. 2, 2010).

On October 26, 2005, Dr. Eric Lung, an ER physician, submitted an EDR for Plaintiff's visit to the Sky Ridge Medical Center. Plaintiff had admitted himself to the emergency room because he thought he had a seizure. (AR 267). Dr. Lung concluded that "[Plaintiff] did not have a seizure. He had some tremulous activity earlier today, possible due to his alcohol abuse." (AR 268). Elsewhere in the report, Dr. Lung characterized Plaintiff as "well known to the emergency department for alcohol abuse." (AR 267). Dr. Lung described the incident as follows:

> [Plaintiff] comes today having what he felt was a seizure. He said this morning when he was laying in bed, he was not feeling well. He had been drinking yesterday as well as earlier today having drinking [sic] Yagermeister and beer. The patient said he started trembling and he did urinate on himself but he was awake the whole time.

(Id.).

ER doctor Paul M. Davidson treated Plaintiff on October 30, 2005. (AR 256-58). He reported that the paramedics found Plaintiff "outside of a bar on the sidewalk." (AR 256). Plaintiff was "agitated" and poorly oriented. (AR 257). He could not remember the month, the year or the president and "smell[ed] of alcohol." (Id.). Dr. Davidson ordered a CAT scan and discovered an acute subdural hematoma, however "[i]t [was] unclear whether this [was] a traumatic subdural as no trauma can be found on examination of [Plaintiff's] face or scalp." (Id.).

5

In a November 7, 2005 Operative Report, the supervising ER doctor at Sky Ridge Medical Center reported, "Recently [Plaintiff] was admitted at Littleton [Adventist Hospital, Colorado] with a subdural hematoma and after a short . . . stay was discharged home.  He was readmitted to Sky Ridge after falling at a hotel after drinking heavily." (AR 240).  This second injury caused the hematoma to grow and the supervising ER doctor to recommend surgery.  (See id.).

On December 8, 2005, Plaintiff underwent a postoperative evaluation by Dr. Lloyd W. Mobley, III, a brain and spine specialist.  (Ar 193-94).  Plaintiff complained of double vision and headaches due to a craniotomy for a subdural hematoma on November 10, 2005.  (AR 193-94).  Dr. Mobley examined Plaintiff and "[did] not find any objective findings, but [thought] [Plaintiff] may have some postoperative headaches for some time." (AR 224).  He recommended that Plaintiff wean himself off Vicodin[4] and try Tylenol.  (AR 193).

In response to a request for information by the Agency, Dr. Martin Pennington, a psychological assistant[5] and director of a sober living facility, provided an assessment of Plaintiff's alcohol recovery and future treatment plans.  (AR 307-11).  He explained that Plaintiff completed an alcohol rehabilitation program in Parker Valley Hope Drug

---

[4]   Vicodin is a narcotic pain reliever used to treat moderate to sever pain.  Web MD, Drugs & Medications – Vicodin Oral, http://www.webmd.com/drugs/drug-63990-Vicodin+Oral.aspx?drugid=63990&drugname=Vicodin+Oral&source=2 (last visited Apr. 2, 2010).

[5]   Dr. Gregg explained that there has been no real psychological testing because "Pennington is not a licensed psychologist, but a psychological assistant."  (AR 342).

and Alcohol Treatment Center on March 9, 2004.  (AR 307).  Plaintiff then moved to a sober living facility in California.  (Id.).  Dr. Pennington reported that Plaintiff still had headaches and depression, and would require "continued therapy treatment at this time." (AR 308). He did not know if Plaintiff would eventually be able to return to work. (Id.).

Dr. Pennington also completed a Mental RFC Questionnaire on September 29, 2008.  (AR 351-55).  In the questionnaire he indicated that Plaintiff had moderate to marked limitations in his ability to function.  (Id.).  He stated that he did not believe Plaintiff currently had the capacity to maintain full time employment.  (Id.).

### 2.  Consultative Physicians

At the request of the Agency, Dr. Halimah McGee, clinical psychologist, examined Plaintiff and completed a Psychological Evaluation.  (AR 312-17).  Dr. McGee submitted the report on June 6, 2007.  (AR 312).  Dr. McGee found Plaintiff's mannerisms and behavior to be within normal range and "socially appropriate." (Id.).  Plaintiff was "alert" and acted as an adequate historian.  (Id.).  Plaintiff's hygiene was also appropriate.

Dr. McGee reported that Plaintiff began drinking alcohol at sixteen.  His last drink was six months ago and he reportedly had two glasses of wine.  In the past, however, Plaintiff drank large amounts of beer and liquor and was "a binge user of cocaine." (AR 314).

Plaintiff also tried LSD, Mescalin, and Ecstasy but had not used them regularly. (Id.).

When assessing Plaintiff's current level of functioning, Dr. McGee explained that Plaintiff currently reads, does laundry, washes dishes, works out at 24-Hour Fitness five days a week, and manages his own money. (Id.). Plaintiff was oriented to time and place. His speech, mood, and affect were all within the normal functioning range. Dr. McGee did not observe any deficiencies in Plaintiff's memory, general fund of knowledge, or insight and judgment. (AR 315). His concentration and attention was also within normal limits; Plaintiff was "able to follow directions and complete all assigned tasks." (Id.).

Dr. McGee concluded that although Plaintiff was "cognitively competent" to manage his own funds, his "history of drug and alcohol abuse would indicate that he might misuse his funds to purchase drugs and\or alcohol." (AR 316). Plaintiff exhibited mild deficits in attention, concentration, and memory, however, based on his performance on the cognitive tests, Plaintiff "is capable of learning a routine, repetitive skill." (AR 317). Plaintiff would be able to maintain regular work attendance, comply with instructions, and interact with coworkers in an appropriate manner. (Id.). "He would not require personal supervision or structure beyond the normal learning period." (Id.).

At the request of the Agency, Dr. Robert Moore, a Board certified neurologist, examined Plaintiff and completed a Neurological Evaluation. (AR 319-22). Dr. Moore submitted the report on June 18,

2007.  (AR 319).  Dr. Moore found that Plaintiff was alert and well-oriented.  (AR 320).  There was no deficiency in his neurological status, but that he had "a minimal decrease in object recall ability." (AR 322; see AR 320).  Consequently, Dr. Moore concluded that Plaintiff "would have slight difficulty following complex commands and performing complex tasks."  (AR 322).  However, Plaintiff would be fully "able to follow simple commands and perform simple tasks."  (Id.).

### 3.   Non-Examining Consultative Physicians

On July 16, 2007, Dr. K.D. Gregg, a state-agency medical consultant and psychiatrist, reviewed Plaintiff's medical records  (AR 327-40). Dr. Gregg completed a Mental Residual Functional Capacity Assessment ("RFC") form that consisted of a series of check-off boxes.  He completed this RFC evaluation based on the evidence in Plaintiff's file. Dr. Gregg only considered Plaintiff moderately limited in two out of the twenty categories: "the ability to understand and remember detailed instructions" and "the ability to carry out detailed instructions."  (AR 338).  In the "'B' Criteria of the Listings," Dr. Gregg did not find Plaintiff impaired in any area that would meet the "[d]egree of limitation that satisfies the functional criterion" to be considered a severe impairment.  (AR 335).  Dr. Gregg also performed a Case Analysis in which he reviewed the opinions of previous doctors, concurring with the analyses by Dr. Moore and Dr. McGee.  (See AR 341-44).

On November 1, 2007, Dr. Henry Amado, a state-agency medical consultant, reviewed Plaintiff's medical records and submitted a brief

Case Analysis.  (AR 345-55).  He concluded that Plaintiff had a mental RFC for unskilled work.  (AR 346).

On November 2, 2007, Dr. Marcia H. Yee, a state-agency medical consultant, reviewed Plaintiff's medical records and submitted a brief Case Analysis.  (AR 347-48).  She affirmed prior findings that Plaintiff's functional limitations were "non-severe."  (AR 348).

### 4.  Medical Expert Testimony

Dr. Craig Rath, a medical expert and certified doctor, testified at Plaintiff's October 20, 2008 hearing after reviewing the medical evidence and listening to Plaintiff's testimony.  (AR 35-43).  Dr. Rath summarized the medical evidence discussed in Part III.A.1-3 for the ALJ. He interpreted the evidence to be fairly consistent and indicate mild to moderate cognitive and functional limitations.  (See AR 39-40, 41) ("[Dr. Rath] agree[d] that [Plaintiff's] impairments more than minimally impact his ability to work.").   Dr. Rath found that the only inconsistency in the evidence lay in Dr. Pennington's opinion.  (AR 40). However, Dr. Rath explained that "I didn't find a lot of that supported in the record" and that "the severity [indicated by Dr. Pennington] is not supported in the rest of the record."  (AR 40,42).

Dr. Rath concluded that Plaintiff's mild to moderate cognitive and functional limitations manifested in an inability to deal with stressful situations.  (AR 41).  When asked by the ALJ what limitations Dr. Rath would place on Plaintiff in the work setting, Dr. Rath replied, "[N]o

more than a moderate stress environment.  High stress would endanger his sobriety . . . [b]ut there would be no other limitations."  (AR 40).

**B.   Plaintiff's Testimony**

Plaintiff complains of depression and difficulty with his memory since April 1, 2003.  (<u>See, e.g.</u>, AR 28, 124, 319) (telling Dr. Moore that he sometimes forgets his bus number and where to transfer).  In his Disability Report, Plaintiff reported problems with "short term memory loss, mental lapses, anxiety, frustration, confusion with simple tasks" (AR 124).  Plaintiff told the ALJ he is not able to work now because of his "severe issues with depression, anxiety [and] . . . brain trauma." (AR 32).  He contends that he cannot take care of himself "like other people."  (<u>Id.</u>).  Plaintiff also admitted to his past drug use (ten years of cocaine abuse) and alcohol dependency.  (AR 33).  Plaintiff participated in a 12-Step program and was almost two years sober at the time of the hearing.  (<u>Id.</u>).  He testified that he swims almost every morning.[6]  (AR 34).

Plaintiff worked as a car salesman from 1995 to 2001.  (AR 32, 124).  Then he worked as a loan officer for a mortgage company from 2001 to the alleged onset of his disability in 2003.  (AR 32, 124). Plaintiff testified on October 20, 2008 that he had been working since October 2007.  (AR 31-32).  He answered phones and worked at the desk

---

[6]  This is consistent with Dr. McGee's report that Plaintiff reads, does laundry, washes dishes, works out at 24-Hour Fitness five days a week, and manages his own money.  (<u>See</u> AR 314).

at Universal Motors, a car lot owned by some friends.  (Id.).  At the time of his hearing, Plaintiff was earning $1500 a month.  (AR 32).

## C.   **Vocational Expert Testimony**

At Plaintiff's October 20, 2008 hearing, the ALJ and Plaintiff's attorney examined Vocational Expert ("VE") Steven M. Barry.  (AR 44-48). The ALJ posed two hypotheticals to Mr. Barry.  The first hypothetical involved an forty-five year old individual with a high school diploma and work experience similar to Plaintiff, but this individual was "limited to no more than a moderate stress environment." (AR 46).  The VE opined that such an individual could perform his past relevant work. (AR 47).  The second hypothetical contained the added restriction, "unable to work an eight hour day, 40 hour week, or miss more than two days of work per month due to his impairments." (Id.).  The VE responded that such an individual could not do any jobs.  (Id.).

When Plaintiff's attorney questioned the VE, he added the following to the ALJ's original hypothetical: unable to maintain concentration beyond two hours.  (Id.).  When asked if this restriction would change the VE's prior conclusions, he responded in the negative.  "[T]ypically breaks are given about every two hours, so that shouldn't be a problem as long as they can again after a break sustain attention for two hours." (AR 48).  Plaintiff's attorney also asked the VE about an individual who could not perform at a consistent pace without an unreasonable amount of rest periods.  The VE replied that if there was a "complete inability" to perform, then that would severely impact employability.  (Id.) (emphasis added).

# IV.

## FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents him from engaging in substantial gainful activity[7] and is expected to result in death or to last for a continuous period of at least twelve months. Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)).  The impairment must render the claimant incapable of performing the work he previously performed and incapable of performing any other substantial gainful employment that exists in the national economy.  Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry.  20 C.F.R. §§ 404.1520, 416.920.  The steps are as follows:

> (1) Is the claimant presently engaged in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.

---

[7]  Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit.  20 C.F.R. §§ 404.1510, 416.910.

           (2)   Is the claimant's impairment severe?  If not, the claimant is found not disabled.  If so, proceed to step three.

           (3)   Does the claimant's impairment meet or equal one of a list of specific impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1?  If so, the claimant is found disabled.  If not, proceed to step four.

           (4)   Is the claimant capable of performing her past work?  If so, the claimant is found not disabled.  If not, proceed to step five.

           (5)   Is the claimant able to do any other work?  If not, the claimant is found disabled.  If so, the claimant is found not disabled.

Tackett, 180 F.3d at 1098-99; see also 20 C.F.R. §§ 404.1520(b)-(g)(1), 416.920(b)-(g)(1); Bustamante v. Massanari, 262 F.3d 949, 953-54 (9th Cir. 2001) (citations omitted).

The claimant has the burden of proof at steps one through four, and the Commissioner has the burden of proof at step five.  Bustamante, 262 F.3d at 953-54.  If, at step four, the claimant meets his burden of establishing an inability to perform past work, the Commissioner must show that the claimant can perform some other work that exists in "significant numbers" in the national economy, taking into account the

14

claimant's residual functional capacity ("RFC"),[8] age, education, and work experience.  Tackett, 180 F.3d at 1098, 1100; Reddick, 157 F.3d at 721; 20 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1).  The Commissioner may do so by the testimony of a VE or by reference to the Medical-Vocational Guidelines appearing in 20 C.F.R. Part 404, Subpart P, Appendix 2 (commonly known as "the Grids").  Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001).

When substance abuse is involved, the ALJ must include an extra analysis in his determination of disability.[9]  As the Ninth Circuit described in Bustamante, the five-step sequential evaluation must first be conducted "without separating out the impact of alcoholism or drug addiction."  262 F.3d at 955.  If after conducting this inquiry, the ALJ concludes that an individual is disabled and there is medical evidence of his drug addiction or alcoholism, then it must be determined whether the claimant would still be disabled absent the substance abuse.  Id.

---

[8]    Residual functional capacity is "the most [one] can still do despite [one's] limitations" and represents an assessment "based on all the relevant evidence in [one's] case record."  20 C.F.R. §§ 404.1545(a), 416.945(a).

[9]    In 1996, Congress enacted Section 105 of the Contract with America Advancement Act, including a subsection entitled "Denial of Disability Benefits to Drug Addicts and Alcoholics."  42 U.S.C. § 423(d)(2)(C).  This statute and the regulations promulgated thereunder operate to deny social security disability benefits to claimants whose alcoholism or drug addiction is a contributing factor material to the determination of his or her disability.  See 20 C.F.R. § 416.935.  Section 423(d)(2)(C) provides that "[a]n individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled."

("The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol.") (citing 20 C.F.R. §§ 404.1535, 416.935(b)(1)). At this stage, the claimant would bear the burden of proving that his alcoholism or drug addiction is not a contributing factor material to his disability determination. <u>Ball v. Massanari</u>, 254 F.3d 817, 822-23 (9th Cir. 2001); <u>see also Sousa v. Callahan</u>, 143 F.3d 1240, 1245 (9th Cir. 1998).

## V.

## THE ALJ'S DECISION

At step one, the ALJ found that Plaintiff had been engaged in substantial gainful activity since the alleged onset date of April 1, 2003. (AR 12-13).[10] That is, Plaintiff's employment from October 2007 to October 2008 at the car lot, resulting in $1500 per month in income, is considered substantial gainful activity.

At step two, the ALJ determined that Plaintiff had the following severe impairments: depressive disorder with anxious features and substance abuse disorder. (AR 13).

---

[10]   In October 2007, Plaintiff starting working at a car lot for $1500 per month. (<u>See</u> AR 13).

16

At step three, the ALJ found that Plaintiff's substance abuse disorder met sections 12.04 and 12.09 of the listings.  (AR 13); see 20 C.F.R. 404.1520(d).

The ALJ then analyzed steps two and three absent Plaintiff's substance abuse.  The ALJ considered Dr. Rath's interpretation of the medical evidence, finding his opinions "well supported by the medical evidence of record."  (AR 14).  After a discussion of the medical evidence from various ER doctors, Dr. Levenson, Dr. Mobely, Dr. Pennington, Dr. McGee, Dr. Moore and Dr. Rath, the ALJ concluded, "these restrictions are related to and caused by [Plaintiff's] substance abuse problems, which continued to be evident throughout the alleged disability period."  (AR 14); (see AR 13-16).  Accordingly, the ALJ found that Plaintiff did not meet the listings absent his substance abuse.  (AR 13-14); see 20 C.F.R. 404.1520(d).  However, Plaintiff's remaining limitations, absent substance abuse, "would cause more than a minimal impact . . . therefore, [Plaintiff] would continue to have a severe impairment."  (AR 14).

At step four, the ALJ determined that without substance abuse, Plaintiff would have the RFC "to perform a full range of work" subject to the following limitation: "no more than moderate stress environment."  (AR 16).  Again, the ALJ engaged in an exhaustive description of the medical evidence and of her reasons for reaching this conclusion.  (See 16-17).  After questioning the VE, the ALJ also determined that Plaintiff could perform relevant past work, i.e., the desk job he most recently held at a friend's car lot.  (AR 18).

In conclusion, the ALJ found, "Because [Plaintiff] would not be disabled if he stopped the substance [ab]use . . . [the] disorder is a contributing factor material to the determination of disability.  Thus, the claimant has not been disabled within the meaning of the Social Security Act."  (AR 18) (citations omitted).

## VI.

## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The court may set aside the Commissioner's decision when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole.  Aukland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001); Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996).

"Substantial evidence is more than a scintilla, but less than a preponderance."  Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005); Reddick, 157 F.3d at 720.  It is "relevant evidence which a reasonable person might accept as adequate to support a conclusion."  Id.  To determine whether substantial evidence supports a finding, the court must "'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'"  Aukland, 257 F.3d at 1035 (quoting Penny v. Sullivan, 2 F.3d 953, 956 (9th Cir. 1993)).  If the evidence can reasonably support either affirming or reversing that conclusion, the court may not substitute its judgment for that of the Commissioner.  Reddick, 157 F.3d at 720-21.

**VII.**

**DISCUSSION**

Plaintiff argues that the record lacks substantial evidence to support the determination that he is not disabled. (Jt. Stip at 5-10). Specifically, Plaintiff disputes the ALJ's determination of Plaintiff's RFC based on the ALJ's allegedly improper rejection of Dr. Moore's, Dr. McGee's, and Dr. Gregg's opinions. (See Jt. Stip at 5).

**A.   The ALJ Properly Considered The Opinions Of Plaintiff's Consultative Physicians**

Plaintiff complains that the ALJ's assessment of Plaintiff's RFC is not supported by substantial evidence because the ALJ did not properly consider the opinions of Plaintiff's treating and examining physicians. (Jt. Stip. at 5, 6, 8). Plaintiff maintains there is not substantial evidence because the ALJ failed to provide specific and legitimate reasons for rejecting Dr. Moore's, Dr. McGee's, and Dr. Gregg's opinions. (Jt. Stip. at 8). Plaintiff asserts that due to this failure, the doctors' opinions must be credited as a matter of law. (Jt. Stip at 8-9) (citing Lester v. Chater, 81 F.3d 821, 832 (9th Cir. 1995)). This Court disagrees.

There exists a hierarchy of physicians reports and opinions in social security cases and their weight is measured accordingly. In general, "the opinions of examining physicians are afforded more weight than those of non-examining physicians and the opinions of examining non-treating physicians are afforded less weight than those of treating

19

physicians." <u>Orn v. Astrue</u>, 495 F.3d 625, 631 (9th Cir. 2007); <u>see also</u> 20 C.F.R. § 404.1527.  The opinions of treating physicians are entitled to special weight because the treating physician is hired to cure and has a better opportunity to know and observe the claimant as an individual.  <u>Magallanes v. Bowen</u>, 881 F.2d 747, 751 (9th Cir. 1989); <u>see also</u> <u>Orn</u> 495 F.3d at 631 (discussing the relationship between patient and treating physician).  Although the treating physician's opinion is entitled to great deference, it is "not necessarily conclusive as to either the physical condition or the ultimate issue of disability."  <u>Morgan v. Comm'r of Soc. Sec. Admin.</u>, 169 F.3d 595, 600 (9th Cir. 1999).  If the non-treating physician bases her opinion on independent clinical findings, "the opinion of the non-treating source may itself be substantial evidence; it is solely the province of the ALJ to resolve the conflict."  <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1041 (9th Cir. 1995); <u>see also</u> <u>Vasquez v. Astrue</u>, 547 F.3d 1101, 1104 (9th Cir. 2008) (holding that the ALJ "is responsible for . . . determining credibility").

The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a non-examining physician.  <u>See</u> <u>Orn</u>, 495 F.3d at 631 (following the standard set in <u>Pitzer v. Sullivan</u>, 908 F.2d 502, 506 (9th Cir. 1990)); <u>Andrews</u>, 53 F.3d at 1043.  Just as a treating physician's opinion may only be rejected for specific and legitimate reasons, the opinion of an examining physician, even if contradicted by another doctor, may "only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record."  <u>Andrews</u>, 53 F.3d at 1043; <u>see also</u> <u>Orn</u>, 495 F.3d at 632 (using the <u>Andrews</u> standard to determine the validity of the ALJ's rejection of a treating physician's findings).

20

Here the ALJ gave specific and legitimate reasons supporting Plaintiff's RFC and explaining the ALJ's rejection of any medical evidence.   Initially, the ALJ explained that she gave "significant weight" to Dr. Rath's opinions as a medical expert and because he was impartial. (AR 17).  Dr. Rath testified that Plaintiff had a depressive disorder with anxiety as well as "severe alcohol and drugs problems." (AR 13, 39).  He opined that Plaintiff's substance abuse caused him to have marked limitations in his overall functioning, as evidenced by the ER doctors' reports.  (AR 13, 38-39).  As summarized in Part III.A.1, Plaintiff was treated numerous times at the ER for intoxication and injuries sustained while intoxicated.   (See AR 240-75) (explaining instances such Plaintiff being so intoxicated that he fell on his bathroom floor, hitting his head and causing a subdural hematoma that later had to be removed surgically).  Dr. Rath referred to these reports in his testimony and relied on them to reach his conclusion that Plaintiff is markedly limited when considering his substance abuse. (See AR 37-40).

Removing substance abuse, Dr. Rath testified that Plaintiff 's functional capacity would be limited only by "no more than a moderate stress environment."  (AR 40).  Dr. Rath worried that a high level of stress could endanger his sobriety.   (Id.).   In reaching this conclusion, Dr. Rath (and the ALJ) also noted that Plaintiff would have "mild difficulties in social functioning" and "moderate difficulties in concentration."   (AR 14).   Medical expert testimony "need not be discounted and may serve as substantial evidence when [the testimony] [is] supported by other evidence in the record and [is] consistent with it."  Andrews, 53 F.3d at 1041 (construing Magallenes, 881 F.2d at 752).

1   Dr. Rath based his conclusion on the previously discussed evidence, and
2   Plaintiff's admission that he works out everyday, swims in the morning,
3   does laundry, commutes to work on public transportation, and has a job.
4   (AR 38-40; see also AR 24, 314).

5

6       Moreover, Dr. McGee reached a similar conclusion.  He found that
7   Plaintiff would be able to maintain regular work attendance, comply with
8   instructions, and interact with coworkers in an appropriate manner.  (AR
9   317).  "He would not require personal supervision or structure beyond
10  the normal learning period."  (AR 317).  His concentration and attention
11  was also within normal limits; Plaintiff was "able to follow directions
12  and complete all assigned tasks."  (AR 315).  Similarly, Dr. Moore's
13  Neurological Examination report indicated that Plaintiff "was alert and
14  oriented," could follow three-step commands and repeat series of digits
15  backwards and forwards.  (AR 320).  Dr. Moore opined that Plaintiff may
16  have "slight difficulty following complex commands and performing
17  complex tasks," but he did say that Plaintiff would be markedly unable
18  to do so.  (AR 322).  Accordingly, the ALJ found Dr. Rath's opinions
19  to be "well supported by the medical record."  (AR 17).

20

21      Second, the ALJ explained that the intensity and persistence of
22  Plaintiff's symptoms "are not credible to the extent that they are
23  inconsistent with the [RFC] for the reasons explained below."  (AR 17).
24  Contrary to Plaintiff's assertion that the opinions were improperly
25  rejected, the ALJ proceeded to credit Dr. McGee and Dr. Moore, stating,
26  "[W]eight is given to the observation and opinions of the consultative
27  examiner Dr. McGee and Dr. Moore."  (Id.; see also AR 15-16) (detailing
28  the results and conclusions of Plaintiff's June 6, 2007, and June 18,

2007, psychological consultative examinations).  After analyzing the findings of Drs. McGee and Moore, the ALJ found that their conclusions supported her ultimate determination of Plaintiff's RFC.  See Vasquez, 547 F.3d at 1104 (holding that where evidence is subject to interpretation, it is up to the ALJ to resolve the conflict).

The ALJ was not obligated to fully credit Dr. Gregg's opinions. The Ninth Circuit has held that "[t]he ALJ need not accept the opinion of any physician, even a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings." Thomas, 278 F.3d at 957; Batson v. Comm'r of Soc. Sec., 359 F.3d 1190, 1195 (9th Cir. 2004); accord Matney v. Sullivan, 981 F.2d 1016, 1019 (9th Cir. 1992).  Dr. Gregg completed a standardized report that consisted of check-off boxes without accompanying narrative or observational analysis. (AR 327-40).  Accordingly, the ALJ did not err in failing to discuss Dr. Gregg's conclusions.

Contrary to Plaintiff's assertion, the ALJ's decision was consistent with the rule in Lester.  (See Jt. Stip. at 8) ("[T]he opinion of a non-examining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician.") (citing Lester, 81 F.3d at 831).  Here, the ALJ relied on more than just medical expert testimony.  (See, e.g., AR 15-16) (showing that the ALJ credited Dr. Moore's and McGee's, as well as other physicians, opinions).  Indeed, the ALJ expressly relied on Dr. McGee's and Dr. Moore's opinions: "In addition, weight is given to the observations and opinions of the consultative examiner Dr. McGee and Dr. Moore." (AR 17).  The ALJ

considered Dr. McGee's assessment that "[Plaintiff] was alert and answered all his questions[,] . . . reads, washes dishes and clothes, works out at 24-Hour Fitness five days per week." (Id.). Moreover, the ALJ considered the medical evidence from Plaintiff's treating physicians. (See AR 13-16) (showing the ALJ's express reliance on the evidence provided from Dr. Levenson and the numerous ER doctors). Where evidence is susceptible to more than one rational interpretation, the ALJ may resolve the conflict. Vasquez, 547 F.3d at 1104; See Morgan v. Commissioner, 169 F.3d 595, 601 (9th Cir. 1998) ("[W]hen evidence is susceptible to more than one rational interpretation, the ALJ's conclusion must be upheld.") (interpreting Andrews, 53 F.3d at 1041 and Magallanes, 881 F.2d at 750). The ALJ considered the evidence as whole, discussed the findings of specific doctors and found that they supported her ultimate determination of Plaintiff's RFC to perform work subject to no more than moderate stress. (AR 16).

Although the ALJ did not specifically address every category in which some doctors found Plaintiff to have mild difficulties, none of these mild limitations contradict the ALJ's conclusion about Plaintiff's RFC. To the extent that the ALJ rejected some of the consultative doctors' opinions, she gave specific and legitimate reasons for doing so. Accordingly, no remand is necessary.

**B.** **Even If The ALJ Failed To Properly Rejection Portions Of The Consultative Doctors' Opinions, Any Error Was Harmless**

Plaintiff argues that the ALJ did not explain in sufficient detail her reasons for disregarding conflicting evidence within the record.

24

1    (See Jt. Stip. at 5-10).    Plaintiff further contends that it was a

2    material error deserving of remand.    (Id.).    This Court disagrees.

3

4         To the extent that the Court could construe the ALJ's decision as

5    a violation of the rule requiring specific and legitimate reasons, any

6    such violation was harmless error because it would not have affected the

7    ALJ's ultimate determination. "[W]here the mistake was nonprejudicial

8    to [Plaintiff] or irrelevant to the ALJ's ultimate disability

9    conclusion," the mistake is a harmless error.    Stout v. Comm'r of the

10   Soc. Sec. Admin., 454 F.3d 1050, 1055 (9th Cir. 2006); see also

11   Carmickle v. Comm'r of the Soc. Sec. Admin., 533 F.3d 1155, 1162 (9th

12   Cir. 2008).

13

14        As discussed above in section VII.A, the record as a whole supports

15   the ALJ's finding Plaintiff is not disabled and that his RFC is limited

16   by his inability to work in high stress environments.    In coming to this

17   conclusion, the ALJ relied on facts beyond those testified to by Dr.

18   Rath.    She relied on such evidence as Plaintiff's job after the alleged

19   onset of disability, his admission to Dr. McGee that he works out five

20   days a week, his testimony at trial that he swims every morning, and Dr.

21   Moore's observations that there was not a marked neurological

22   deficiency.    (AR 16-17, 315, 34; see AR 320).

23

24        Considering the remainder of the evidence, any error the ALJ may

25   have made by failing to fully provide a specific reasons for discounting

26   Dr. Moore's, Dr. McGee's, and Dr. Gregg's opinions would not have

27   sufficiently altered the ALJ's conclusions regarding Plaintiff's RFC.

28   No remand is required.

## VIII.

### CONCLUSION

To the extent that the ALJ rejected some of the consultative doctors' opinions, she gave specific and legitimate reasons for doing so.  The ALJ noted that some of the medical evidence was inconsistent with a large portion of the record.  (AR 17).  To the extent that it conflicted, she discounted it.  (AR 17).  Plaintiff's RFC was also supported by substantial evidence.  The weight of record supports the ALJ's determination.  Moreover, Dr. Moore's and Dr. McGee's reports were actually consistent with Dr. Rath's testimony and the ALJ conclusions. (See infra p. 22-23).  Accordingly, no remand is necessary.

Consistent with the foregoing, and pursuant to sentence four of 42 U.S.C. § 405(g),[11] IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner and dismissing this action with prejudice. IT IS FURTHER ORDERED that the Clerk of the Court serve copies of this Order and the Judgment on counsel for both parties.

DATED: April 21, 2010

_____/S/_____
SUZANNE H. SEGAL
UNITED STATES MAGISTRATE JUDGE

---

[11]    This sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."